# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DERRICK JOHNSON, ET AL.**                    **CIVIL ACTION**

**VERSUS**                                          **No. 11-1991**

**STATE FARM MUTUAL**                          **SECTION I**
**AUTOMOBILE INSURANCE**
**COMPANY**

## ORDER AND REASONS

Before the Court is a motion[1] for partial summary judgment and a motion[2] *in limine* to

exclude expert testimony filed by defendant, State Farm Mutual Automobile Insurance Company

("State Farm"). Plaintiffs, Derrick Johnson ("Johnson") and Sheena Russell ("Russell"), have

filed oppositions with respect to both motions.[3] For the following reasons, defendant's motion

for partial summary judgment is **GRANTED**. Defendant's motion *in limine* to exclude expert

testimony is **GRANTED IN PART** and **DEFERRED IN PART**.

### *BACKGROUND*

Plaintiffs allege that their 2005 BMW 645 CI was stolen from just outside the bedroom

window of their home, approximately one car length from where they were sleeping, on the night

of July 28, 2010.[4] Plaintiffs called the police when they discovered the theft the following

morning.[5] Johnson reported to the police that he had parked the vehicle in his driveway at

approximately 8:00 p.m. the previous evening.[6] He stated that he had locked and secured the

---

[1] R. Doc. No. 25.
[2] R. Doc. No. 24.
[3] R. Doc. Nos. 29, 30.
[4] R. Doc. No. 1-1; R. Doc. No. 25-17, at ¶ 4.
[5] *See* R. Doc. No. 25-7.
[6] *Id.*

1

vehicle's doors and windows.[7]  Johnson later confirmed that the vehicle had been locked and that the system responded by flashing the lights and sounding the horn to show that the security system had been activated.[8] Plaintiffs did not report hearing a car alarm, squealing tires, breaking glass, or the sound of the car being towed when the car was stolen.[9]  Plaintiffs also observed no broken glass in the driveway or tire marks suggesting that the vehicle had been dragged away.[10]

On July 29, 2010, the same day they discovered the purported theft, plaintiffs filed a claim for insurance coverage under their State Farm issued automobile policy.[11]  State Farm immediately initiated loss adjustment and investigated the claim.[12]  State Farm claims that its investigation revealed several inconsistencies that cast the claim in a suspicious light, including the fact that the BMW was soon discovered, fully burned, in a rural area near I-55 in Tangipahoa Parish on the morning of July 30, 2010, within a short period of time of its being reported stolen.[13]

State Farm retained ARC Forensics, Inc. ("ARC Forensics") to provide an opinion on the anti-theft system of the BMW and to provide guidance with respect to whether evidence supported the allegations that the loss resulted from theft.[14]  On October 11, 2010, ARC forensics concluded that (1) forced entry was inconclusive due to the fire; (2) the fire was incendiary in cause; (3) the vehicle was equipped with the BMW encrypted Transponder Immobilizer System; (4) the vehicle could not be started without a properly programmed key; (5) the two keys in the possession of plaintiffs were not recently used as a pattern to create duplicates; (6) the two keys

---

[7] *Id.*
[8] R. Doc. No. 25-17.
[9] *See* R. Doc. No. 25-7; R. Doc. No. 25-15; R. Doc. No. 25-8, at pp. 5-7; R. Doc. No. 25-17, at ¶ 21.
[10] *Id.*
[11] R. Doc. No. 25-17, at ¶ 3.
[12] *Id.* at ¶ 7.
[13] *Id.* at ¶¶ 6, 8- 9.
[14] *Id.* at ¶ 12; R. Doc. No. 25-5.

provided were the two master keys to the vehicle; (7) the vehicle is shipped with two master keys, one valet key, and one billfold key; and (8) the BMW was not stripped of any factory installed components other than the wheels.[15]

Johnson later reported that there were only two keys to the BMW and that there were no other keys to the car.[16] He also stated that the keys were never duplicated and that he never loaned the keys to anyone.[17]

State Farm interviewed Johnson and Russell several times during its investigation and it noted several inconsistencies in plaintiffs' statements regarding the theft.[18] First, according to the police report on July 29, 2010, Johnson stated that he had last driven the BMW on the night before the theft and that he had parked the car in his driveway at approximately 8:00 p.m.[19] During a recorded statement for State Farm on August 2, 2010, however, Johnson stated that he had last driven the vehicle two months before the theft.[20] Second, on August 19, 2010, Johnson indicated in a recorded statement that he was the first to discover the missing car.[21] Johnson contradicted that statement on January 19, 2011, during an Examinations Under Oath, in which he testified that he was still in bed when Russell told him that the BMW was missing.[22] Finally, State Farm claims that plaintiffs denied shopping for a new car, but that its investigation revealed that Ray Brandt Nissan ran a credit inquiry for Sheena Russell on March 30, 2010.[23]

---

[15] R. Doc. No. 25-5, at p. 4.
[16] R. Doc. No. 25-17, at ¶ 15.
[17] *Id.*
[18] R. Doc. No. 25-17, at ¶ 10.
[19] *Id.* at ¶ 11.
[20] *Id.*
[21] R. Doc. No. 25-15, at p.2.
[22] R. Doc. No. 25-8, at p. 3.
[23] R. Doc. No. 25-1, at p. 21; R. Doc. No. 25-17, at ¶ 30.

State Farm also claims that plaintiffs had a financial motive to burn the BMW.[24] Plaintiffs had three cars at the time of the theft and Johnson testified that the BMW was a "Sunday" car that "barely got driven."[25] Johnson was "upside down" on the auto loan because the actual cash value of the BMW was $31,550, while the loan payoff was $33,873.65.[26] Johnson had a history of untimely payments with respect to the $915 monthly car note, submitting late payments six times between April 2008 and August 2010.[27] Moreover, at the time of the theft, the combined monthly payment for plaintiffs' three vehicles amounted to $1,920.[28] Plaintiffs' combined monthly expenses amounted to approximately $4,929.[29] Their combined monthly income amounted to only $4,818.[30]

On June 17, 2011, after "a thorough and detailed investigation," State Farm denied the claim.[31] State Farm advised plaintiffs that the claim was denied based upon its determination that (1) it was unlikely that a covered loss occurred; (2) plaintiffs were not truthful in the presentation of their claims; and (3) plaintiffs did not fully cooperate with the investigation.[32] State Farm highlighted its policy exclusions relating to intentional damage or theft by an insured, concealment or fraud, and the insured's duties to cooperate.[33]

Plaintiffs filed this lawsuit on June 29, 2011, alleging that they fully cooperated with the investigation of the claim and that State Farm handled their claim in an arbitrary and capricious

---

[24] R. Doc. No. 25-1, at pp. 19-20.
[25] R. Doc. No. 25-17, at ¶ 27.
[26] *Id.* at ¶ 28.
[27] *Id.* at ¶¶ 25- 26.
[28] *Id.* at ¶ 24.
[29] *Id.* at ¶ 29.
[30] *Id.*
[31] *Id.* at ¶ 31.
[32] R. Doc. No. 25-14.
[33] *Id.*

fashion.[34]  Plaintiffs alleged that their claim had been pending for almost one year and that State

Farm had violated its statutory duties of good faith by failing to make a reasonable attempt to

make plaintiffs whole.[35]  Plaintiffs seek bad faith damages and attorney's fees pursuant to

Louisiana Revised Statute § 22:655.[36]

        After filing their lawsuit, plaintiffs retained Robert Painter ("Painter") to review and

critique the ARC Forensics report.[37]  Painter offers himself as an auto theft expert, forensic

locksmith expert, and vehicle fire expert with actual experience as a professional car thief.[38]  On

February 20, 2012, Painter opined that the ARC Forensics report "as to most . . . conclusions are

not factual, and are . . . opinion with no basis."[39] Painter attacks the conclusions set forth in the

ARC Forensics report that (1) the fire was incendiary; (2) the vehicle had a functioning BMW

encrypted transponder immobilizer system; (3) it would be impossible to start and drive the

vehicle without a properly programmed key; and (4) the two keys were not recently used as a

pattern to create duplicates.[40]  Painter also states that report fails to account for the fact that the

plastic billfold key may have been located in the owner's manual inside the vehicle.[41]

        State Farm filed the present motion for partial summary with respect to plaintiffs' claims

for bad faith penalties and to exclude the testimony of Painter.[42]  State Farm argues that there is

no evidence that it acted arbitrarily and capriciously when denying plaintiffs' claims for

insurance coverage.[43]  State Farm also argues that Painter's testimony should be excluded on the

---

[34] R. Doc. No. 1-1.
[35] *Id.*
[36] *Id.*
[37] *See* R. Doc. No. 29-1.
[38] *Id.* at p.8;  R. Doc. No. 24-4, pp. 7, 25-26.
[39] R. Doc. No. 29-1, at p.1.
[40] *Id.* at pp. 1-6.
[41] *Id.* at p. 5.
[42] R. Doc. No. 25.
[43] *Id.*

grounds that Painter is not qualified to testify as an expert and his opinion is not the product of a reliable expert analysis.[44]

*DISCUSSION*

## I. Bad Faith

### A. Standard of Law

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Celotex*, 477 U.S. at 323; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

---

[44] R. Doc. No. 24.

477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (internal quotation and citation omitted) (alteration in original).

### B. Analysis

Louisiana law establishes that insurers owe certain duties to their insureds when adjusting and paying claims. Louisiana Revised Statute § 22:1892 provides a penalty for an insurer's failure to pay a claim within thirty days after receipt of satisfactory proof of loss if the failure was arbitrary, capricious, or without probable cause.[45] Louisiana Revised Statute § 22:1973 provides that an insurer owes a duty of good faith and fair dealing to an insured and it similarly

---

[45] § 22:1892 provides in pertinent part:

> A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:1811, 1821, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest. The insurer shall notify the insurance producer of record of all such payments for property damage claims made in accordance with this Paragraph. . . .

> B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

provides a penalty for an insurer's failure to pay a claim within sixty days after receipt of satisfactory proof of loss if the failure was arbitrary, capricious, or without probable cause.[46] These statutes prohibit "virtually identical" conduct, the primary difference being the time periods allowed for payment.[47] *Korbel v. Lexington Ins. Co.*, 308 Fed. App'x 800, 803 (5th Cir. 2009)(quoting *Reed v. State Farm Mut. Auto. Ins. Co.*, 857 So. 2d 1012, 1020 (La. 2003)).

In order to recover penalties pursuant to these statutes, the insured must establish: "(i)

---

[46] § 22:1973 provides in pertinent part:

> A. An insurer . . . owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
>
> B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
>
> (1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
>
> (2) Failing to pay a settlement within thirty days after an agreement is reduced to writing.
>
> (3) Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured.
>
> (4) Misleading a claimant as to the applicable prescriptive period.
>
> (5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
>
> (6) Failing to pay claims pursuant to R.S. 22:1893 when such failure is arbitrary, capricious, or without probable cause.
>
> C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

[47] As of January 1, 2009, §§ 22:658 and 22:1220 were recodified as §§ 22:1892 and 22:1973, respectively. La. Acts 2008, No. 415, § 1.

that the insurer received a satisfactory proof of loss, (ii) that the insurer failed to pay the claim within the applicable statutory period, and (iii) that the insurer's failure to pay was arbitrary and capricious." *Grilleta v. Lexington Ins. Co.*, 558 F.3d 359, 368 (5th Cir. 2009) (quoting *Boudreaux v. State Farm Mut. Auto. Ins. Co.*, 896 So.2d 230, 233 (La. Ct. App. 2005)); *see also Reed*, 857 So. 2d at 1020; *Block v. St. Paul Fire & Marine Ins. Co.*, 742 So. 2d 746, 752 (La. Ct. App. 1999).

The Louisiana Supreme Court has interpreted "arbitrary and capricious" to mean vexatious. *La. Maint. v. Certain Underwriters*, 616 So. 2d 1250, 1253 (La. 1993). A vexatious refusal to pay is a refusal that is "unjustified, without reasonable or probable cause or excuse." *La. Bag Co., Inc.*, 999 So. 2d at 1114 (citing *Reed v. State Farm Mut. Auto Ins. Co.*, 857 So. 2d at 1021). The insured must "clearly show[ ] that the insurer was arbitrary, capricious, and without probable cause in refusing to pay." *Block*, 742 So. 2d at 751; *Reed*, 857 So. 2d at 1021. "Whether or not a refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its action . . . ." *Reed*, 857 So. 2d at 1021. "The statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense." *Id.* These statutes are "penal in nature and, consequently, must be strictly construed." *Hart v. Allstate*, 437 So. 2d 823, 827 (La. 1983).

A determination of whether an insurer's failure to pay a claim was arbitrary and capricious is a finding of fact. *Grilleta*, 558 F.3d at 368. Summary judgment is not appropriate when a claim for bad faith penalties depends on factual determinations concerning the reasonableness of the insurer's actions. *Hartenstein v. State Farm Fire and Cas. Ins. Co.*, No. 07-4594, 2008 WL 2397713, at *3 & n.22 (E.D. La. June 10, 2008) (Africk, J.) (denying motion for summary judgment when the plaintiff's pre-litigation expert presented insurer with

information that contradicted the insurer's expert report and created fact issue regarding the reasonableness of the insurer's conduct). However, "[u]nder the *Celotex* standard, if the nonmoving party will bear the burden of proof at trial, then it is incumbent upon that party to set out specific facts showing that a genuine issue exists in order to defeat a summary judgment motion." *Gates v. Auto Club Family Ins. Co.*, No. 06-4394, 2007 WL 1464259, at *3 (E.D. La. May 17, 2007) (Vance, J.) (granting summary judgment when plaintiffs failed to provide any facts indicating that the insurer's conduct was arbitrary and capricious); *Duhon v. State Farm Mutual Automobile Insurance Co.*, 952 So. 2d 908 (La. Ct. App. 3d. Cir. 2007) (same).

In *Duhon v. State Farm Mutual Automobile Insurance Co.*, 952 So. 2d 908 (La. Ct. App. 3d. Cir. 2007), the Louisiana Third Circuit Court of Appeal considered whether an issue of fact precluded summary judgment on a claim for bad faith penalties when an insurance company decided to defend, rather than pay, a dubious claim coverage. In *Duhon*, the plaintiff filed a claim for insurance coverage with State Farm the day after reporting that his 2002 Ford F150 Harley Davidson special edition pick-up truck was stolen from a parking lot while he was inside a restaurant. *Id.* at 909. When State Farm received information that the plaintiff had asked someone to steal the truck and burn it, it conducted an investigation into the veracity of the claim. *Id.* The truck was equipped with Ford's passive anti-theft system and a code alarm system. *Id.* The security system required the use of a key containing a chip programmed for the vehicle's computer to operate the vehicle. *Id.* The plaintiff testified that he had locked the truck before entering the restaurant and remembered "setting the alarm, hearing it chirp, and checking the doors to be sure they were locked . . . ." *Id.* at 910. The plaintiff then gave conflicting accounts regarding the existence and location of a second key to the truck. *Id.* at 909-10. While the plaintiff initially stated that he may have left the second key inside the truck with one

window rolled down, he later testified under oath that the second key had been lost at his home.

*Id.*  The plaintiff also gave several conflicting statements about his activities and whereabouts on the day of the theft that did not match cell phone records showing his location.  *Id.* at 909.

Finally, State Farm noted the presence of some of the National Insurance Crime Bureau Indicators of Vehicle Theft Fraud, including the facts that the vehicle: (1)  was new or late model with no lien holder, (2) had been recently purchased, and (3) had been customized.  *Id.*

 The Court affirmed summary judgment with respect to the plaintiff's claims that State Farm had acted in bad faith in choosing to investigate the validity of the stolen vehicle rather than "simply paying the claim without question."  *Id.* at 912.  The Court explained,

> The facts presented make it obvious that this is not a clear cut theft or loss of a vehicle . . . We disagree with Duhon's assertions that the trial court made credibility determinations in finding that State Farm was not arbitrary and capricious. The trial court correctly noted that whether or not the vehicle was stolen requires a credibility determination and denied the motions for summary judgment in that respect. The determination of whether State Farm was arbitrary and capricious in its handling of Duhon's claim does not require a credibility determination or weighing of the evidence in this case. The evidence shows that State Farm conducted an investigation of the claim which revealed several inconsistencies in Duhon's story. Duhon presented no evidence to show that State Farm was arbitrary and capricious.

The facts presented in this case make it similarly obvious that this is not a clear cut theft or loss of a vehicle.  The BMW was discovered burned in a rural area shortly after it was reported stolen and it was not stripped of any major component parts other than the wheels.

Plaintiffs allegedly provided inconsistent statements with respect to the facts and circumstances before and after the alleged theft.  ARC Forensics' expert examination of the vehicle further revealed that the vehicle could only move under its own power with a properly programmed key and plaintiffs confirmed that they had the only two properly programmed keys for the vehicle.

There was no evidence of forced entry and plaintiffs denied hearing any car alarms, breaking glass, squealing tires, or tow trucks despite the fact that the vehicle was stolen from just outside of their bedroom window.  Plaintiffs' financial condition also provided the appearance of a strong motive for fabricating a theft of the vehicle.  Plaintiffs have come forward with no facts showing that State Farm lacked a reasonable basis to investigate and defend against the claim rather than to "simply pay[] the claim without question."[48]  Accordingly, summary judgment is appropriate in this case with respect to plaintiffs' claims for bad faith penalties and attorney's fees under La. R.S. §§ 22:1892 and 1973.

## II.  Robert Painter's Expert Testimony

### A.  Standard of Law

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony.  Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588, 113 S. Ct. 2786, 2794, 125 L. Ed. 2d 469, 480 (1993); *United States v. Hitt*, 473 F.3d 146, 148 (5th Cir. 2006). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The United States Supreme Court's decision in *Daubert* "provides the analytical framework for determining whether expert testimony is admissible under Rule 702."  *Pipitone v.*

---

[48] To the extent that Robert Painter's expert report may be considered evidence contradicting ARC Forensics' expert report, the Court notes that such evidence was produced long after the claim was denied and this litigation commenced. *See Gates,* 2007 WL 1464259,at *4 ("A contractor's future determination that plaintiffs sustained wind damage in excess of $45,102 would not demonstrate that Auto Club's pre-litigation conduct was arbitrary or capricious.").

*Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238, 249-50 (1999).

A number of nonexclusive factors may be relevant to the reliability inquiry, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see Runnels v. Tex. Children's Hosp. Select Plan*, 167 Fed. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has 'considerable leeway' in determining 'how to test an expert's reliability.' " (citing *Kumho Tire*, 526 U.S. at 152, 119 S. Ct. at 1176, 143 L. Ed. 2d at 253)). "Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under [Rule] 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).

When expert testimony is challenged under *Daubert*, the burden of proof rests with the party seeking to present the testimony. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). To meet this burden, a party cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology. Rather, some objective, independent

validation of the expert's methodology is required. *Id.* Nonetheless, as Judge Vance stated in *Scordill v. Louisville Ladder Group, L.L.C.*, 2003 WL 22427981, at *3 (E.D. La. Oct. 24, 2003):

> The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. See *Daubert*, 509 U.S. at 596. As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987)). The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to " 'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.' " *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

With respect to determining the relevancy of an expert's testimony pursuant to Rule 702 and *Daubert*, the proposed testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). " 'There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.' " *Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (quoting Fed. R. Evid. 702 advisory committee's note).

**B. Analysis**

As stated above, plaintiffs retained Robert Painter ("Painter") to review and critique the ARC Forensics report after the litigation commenced.[49]  Painter offers himself as an auto theft expert, forensic locksmith expert, and vehicle fire expert with actual experience as a professional car thief.[50]  Painter's report attacks the conclusions set forth in the ARC Forensics report that (1) the fire was incendiary; (2) the vehicle had a functioning BMW encrypted transponder immobilizer system; (3) it would be impossible to start and drive the vehicle without a properly programmed key; and (4) the two keys were not recently used as a pattern to create duplicates.[51]  Painter also states that the report fails to account for the fact that the plastic billfold key may have been located in the owner's manual inside the vehicle.[52]  Plaintiffs argue that Painter is qualified to present this testimony as an expert on the ground that he has been involved in the investigation of stolen vehicles as a forensic auto theft examiner since 2000 and that he has more than twelve years of experience in the industry.[53]

State Farm raises several compelling arguments for refusing to find that Painter is qualified to offer an opinion as a forensic locksmith, vehicle forensic expert, or vehicle fire expert in this case.  First, State Farm argues that while Painter claims to be an auto theft expert with actual experience as a professional car thief, he admitted in his deposition that he has no experience stealing BMW vehicles and that he has never tried to defeat a BMW Transponder Immobilizer Systems.[54]  Second, State Farm notes that Painter's certification as a forensic

---

[49] R. Doc. No. 29-1, at p.1.
[50] *Id.* at p.8;  R. Doc. No. 24-4, pp. 7, 25-26.
[51] R. Doc. No. 29-1, at pp. 1-6.
[52] *Id.* at p. 5.
[53] R. Doc No. 29.
[54] *See* R. Doc. No. 24-4, at p. 30.  Painter testified as follows:
    Q.  Have you ever owned a 2005 BMW?
    A.  No.
    Q.  Have you ever stolen a 2005 BMW?
    A.  I could.

locksmith by the International Association of Investigative Locksmiths was revoked in 2006 due to ethical violations and that he has done nothing to update his certification by the American Locksmiths of America since 1999.[55] State Farm also notes that Painter's ASE certifications for vehicle repair expired long ago.[56] Third, State Farm argues that Painter's resume lists designations and titles that he created for himself, such as Senior Forensic Analyst Consultant, Certified Forensic Auto Theft Examiner, L5, and Forensic Vehicle Component Analyst.[57] State Farm contends that some of those designations came from organizations that no longer exist and which Painter created for the purpose of awarding himself a designation.[58] Finally, while Painter states in his resume numerous times that he is qualified as an origin and cause expert, Painter admitted in his deposition that he does not consider himself to be an expert in arson, cause and origin, or criminology.[59]

Having carefully reviewed Painter's report, resume, and deposition testimony, the Court finds that Painter is not qualified to critique the finding in the ARC Forensics report that the fire was incendiary in cause. While Painter may have experience investigating auto theft cases involving burned vehicles, Painter admitted under oath in his deposition that he does not

---

. . .
Q.  Have you ever stolen one?
A. No.
Q.  Have you ever tried to steal one?
A. No.
. . .
Q.  Have you ever tried to defeat the immobilizer system in a 2000 -- in a 2005 BMW?
. . .
A.  No.
[55] *See* R. Doc. No. 24-5; R. Doc. No. 24-4, at p. 20.
[56] R. Doc. No. 24-4, at pp.19-20.
[57] *Id.* at pp. 22-24.
[58] *See id.*
[59] *Id.* at pp. 8, 26.

consider himself an expert in arson or cause and origin.[60]  Herbert Miller and Timothy Romine,

who signed the ARC Forensics report, are Certified Fire and Explosion Investigators and

members of the International Association of Arson Investigators.[61]  Their investigation of the

vehicle in question revealed "[d]emarcation lines of burning and down burning [that] were

consistent with the distribution of a large quantity of ignitable liquid or some type of an unusual

fuel load.   It was ignited by an outside ignition source such as a match or lighter.  It was

determined that this fire was incendiary in cause . . . ."[62]  Allowing Painter to refute that

conclusion as an expert would flout the purpose of Rule 702, especially when he has testified

under oath that he does not consider himself an expert in arson or cause and origin.

     Painter does appear to be qualified to challenge the remaining conclusions in the ARC

Forensics report, namely, that the vehicle had a functioning BMW encrypted transponder

immobilizer system, that it would be impossible to start and drive the vehicle without a properly

programmed key, that the two keys were not recently used as a pattern to create duplicates, and

that the report fails to account for the fact that the plastic billfold key may have been located in

the owner's manual inside the vehicle.  While State Farm's concerns with respect to the apparent

inaccuracies in Painter's resume may be legitimate, this Court agrees with the U.S. District Court

for the Northern District of Texas's conclusion in a similar case in which Painter participated as

---

[60] Despite the fact that he claims to be such an expert in his resume, Painter admitted in his deposition, under oath, that he does not consider himself to be an expert in arson or cause and origin.  Painter testified as follows:

     Q.  Are you in fact a cause and origin expert?
     A.  Um, I instruct on vehicle fires.
     Q.  I understand that.  But my question to you is:  Do you consider yourself to be
     an expert on cause and origin?
     A.  No.
     Q.  And do you consider yourself to be an expert on arson?
     A.  No.

R. Doc. No. 24-4, at p. 26.
[61] R. Doc. No. 25-5.
[62] *Id.* at pp. 4-5.

an expert witness:

> Despite these apparent inaccuracies-which if established at trial could provide State Farm considerable ammunition for crossexamination-the court finds that Painter is qualified to offer the opinions at issue. The record demonstrates that Painter has extensive experience and training in the field of vehicle forensics and forensic locksmithing. He is frequently consulted as an expert on the topic and has almost two decades of experience working with recovered vehicles, repairing an estimated 10,000 theft-recovered and fire-damaged vehicles. He has written extensively in the area and conducted numerous seminars on vehicle forensics, even being hired to train insurance company employees. He has clearly specialized in vehicle forensics and gained relevant experience. Despite State Farm's specific objections to putatively misleading items on Painter's resume, it cannot suggest that Painter lacks expertise in the subject matter.

*Nunn v. State Farm Mut. Auto. Ins. Co.*, No. 08-1486, 2010 WL 2540754, at *7 (N.D. Tex. June 22, 2010).

Although Painter may be qualified to testify generally on such topics, to be admissible, plaintiffs must also show that Painter's testimony is reliable and relevant. The substance of Painter's opinion does not contain any affirmative conclusions concerning the theft, such as whether the vehicle had actually been stolen or whether it had last been operated with a properly programmed key. As State Farm observes, Painter did not examine the vehicle or its keys and he conducted no factual investigation or science-based research. Painter merely critiqued the conclusions in the ARC Forensics report based on his knowledge and experience in the field.

Specifically, Painter criticizes the conclusions in the ARC Forensics report that the vehicle had a functioning BMW encrypted transponder immobilizer system, that it would be impossible to start and drive the vehicle without a properly programmed key, that the two keys were not recently used as a pattern to create duplicates, and that the vehicle had been shipped

with two master keys, one valet key, and one billfold key.[63]  Painter notes that ARC Forensics determined in its investigation that all of the vehicle's anti-theft components were destroyed in the fire.[64]  Painter opines that without such evidence, ARC Forensics merely assumed that the vehicle came equipped with a functioning encrypted transponder immobilizer system.[65]  Painter also criticizes ARC Forensics for only examining the two master keys for recent duplication.[66]  Painter opines that ARC Forensics merely assumed that no other keys, such as a valet key, could have been used to steal the car or to create duplicate keys.[67]  Painter also states that in his experience, "the most common method of theft was to use the 'unknown' plastic transponder key in the owner's manual located in the glove box."[68]  Painter concludes that Herbert Miller, who signed the ARC Forensics report, "is not telling the whole truth here.  Only half-truths."[69]

This Court agrees with State Farm that most of Painter's criticisms of the ARC Forensics report are based on speculative theories that are neither relevant nor reliable.  For example, Painter conducted no factual investigation to support his speculation that the BMW may not have come factory equipped with the encrypted transponder immobilizer system.  To the extent that his testimony would highlight the possibility that the security system was not properly functioning, ARC Forensics has already admitted that it was unable to determine whether the security system was properly functioning because "all of the vehicle's anti-theft components were destroyed."[70]  As a result, Painter's opinion is not relevant to explain to a jury that ARC

---

[63] *See* R. Doc. No. 29-1.
[64] *Id.* at 3-4.
[65] *Id.*
[66] *Id.* at 4.
[67] *Id.*
[68] *Id.* at 5.
[69] *Id.* at 6.
[70] There is also no basis in fact for Painter's concern that ARC Forensics failed to consider whether a valet key had recently been duplicated.  Marianne Caulfield, an employee of BMW, attested that only two master keys and one plastic wallet key were issued for that particular vehicle. R. Doc. No. 25-9.  Plaintiffs further testified that when they

Forensics failed to take into account the possibility that vehicle did not have a functioning security system. Plaintiffs will be able to cross-examine State Farm's expert on that topic without Painter's expert testimony.

Painter's "report" appears, for the most part, to be nothing more than argument and disagreement. The reliability of Painter's opinions cannot be readily discerned from his report. At this stage of the proceedings, however, the Court is of the opinion that, notwithstanding its skepticism regarding the admissibility of such testimony, addressing the admissibility of Painter's testimony is best left to be heard at trial.

*CONCLUSION*

For the foregoing reasons,

**IT IS ORDERED** that defendant's motion for partial summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that the motion *in limine* to exclude the expert testimony of Robert Painter is **GRANTED IN PART.** Painter will not be permitted to testify with respect to the cause and origin of the vehicle fire. The remainder of defendant's motion *in limine* is **DEFERRED UNTIL TRIAL**.

New Orleans, Louisiana, May 16, 2012.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

bought the vehicle used, it came only with the two master keys. Accordingly, Painter's suggestion that the valet key could have been duplicated is without foundation.